[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 8, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-12967

_____

D. C. Docket No. 00-00535 CR-PCH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LEVETTE VANGATES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 8, 2002)**

Before MARCUS, FAY and WINTER[*], Circuit Judges.

MARCUS, Circuit Judge:

At issue in this appeal is whether certain statements made by a correctional

officer are protected under the Fifth Amendment to the Constitution and Garrity v.

New Jersey, 385 U.S. 493, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967).  Specifically,

_____

[*]Honorable Ralph K. Winter, Jr., U.S. Circuit Judge for the Second Circuit, sitting by
designation.

appellant Levette Vangates contends that her conviction for deprivation of a prison inmate's constitutional rights under color of law and obstruction of justice should be overturned because the district court erroneously concluded that her testimony from a previous civil trial was admissible in the criminal proceeding. Because we are satisfied that Vangates could not have formed an objectively reasonable belief that her testimony in the civil case was compelled by any <u>state</u> action, we conclude that the district court found correctly that the testimony was not protected by <u>Garrity</u> or the Fifth Amendment, and we affirm the conviction.

I.

On July 20, 1995, Novelette Hamilton was arrested for failing to complete community service pursuant to a shoplifting conviction. After spending a night in the Women's Detention Center, she was transported to the Pretrial Detention Center in Miami, Florida and sentenced to time served. As she was being processed for release, Hamilton was assaulted. After her release, Hamilton reported the assault to the Department of Corrections and said that she had been beaten by three correctional officers whom she later identified as the defendants, Vangates, Brigetta Mas, and Rena Symonette.

Soon thereafter, an Internal Affairs investigation was conducted regarding the incident. As part of the investigation, each officer was interviewed by Sergeant

Mary Williams, the investigator assigned to the case. Each officer was required to sign three forms entitled "Subject Employee Notification," "Subject Employee Statement," and "Rights of Subject Officers in Internal Affairs Investigation" prior to her interview. These documents expressly informed each officer that she would be subject to discipline and possibly dismissal if she refused to answer the investigator's questions about her work performance and that her statements to Internal Affairs could not be used against her in a subsequent criminal proceeding, except one for perjury, but that they could be used against her in relation to

departmental charges.[1]  Williams completed her report in 1996, and the Internal

Affairs investigation was closed in November 1999.

_____

[1]In relevant part, the Subject Employee Statement read:

> You are required to give a statement for Administrative purposes. You will be asked questions specifically, directly, and narrowly related to the performance of your official duties or continued fitness for office.  I further advise you that if you refuse to answer questions relating to the performance of your official duties or fitness for duty, you are subject to Departmental charges which could result in your dismissal from the Dade County Department of Corrections.  If you do answer, neither your statement nor any information or evidence which is gained by reason of such statements, can be used against you in any subsequent criminal proceeding, except perjury.  However, these statements may be used against you in relation to subsequent departmental charges.

Similarly, the "Subject Employee Notification" informed each officer that she would be questioned and provided a summary of Hamilton's allegations.  It also quoted certain rules from the Department Manual requiring the officers to "answer or render material and relevant statements to the [investigators] when so directed," to "answer all questions honestly and, completely and to the best of their ability," and to refrain from interfering with the investigation in any way or communicate internal information to persons outside the department.  Finally, it informed the officers that they were entitled to notice of the interview, could have legal counsel at the interview, and would be informed fully if criminal charges were likely to be pursued against them.  The third form, the "Rights of Subject Officers in Internal Affairs Investigation," repeated the pre-interview rights listed above and informed the officers of their rights during and after the interview.  Specifically, the officers were to be interviewed at a place and time convenient to them and in a professional manner, and they were to be compensated for the time spent in the interview if it was conducted during off-duty hours.

In 1996, Hamilton filed a § 1983 civil rights action in the United States District Court for the Southern District of Florida seeking damages stemming from the assault. (Hamilton v. Metropolitan Dade County, Case No. 95-1759-DLG.) She named Metropolitan Dade County and the three officers, in both their individual and official capacities, as defendants in the suit. Pursuant to the terms of its collective bargaining agreement, the County Attorney's office represented the officers, except to the extent each was sued individually for punitive damages. To defend the punitive damages claims, the County hired separate counsel to represent the officers in their individual capacities. The case went to trial in January 1997, and was settled while being presented to the jury.

At trial, the plaintiff introduced into evidence, as an exhibit during Sgt. Williams's testimony, the Internal Affairs investigative file regarding the incident, which contained transcripts and tape recordings of Williams's interviews with the officers. In addition, Williams testified without objection about the interviews and quoted summaries found in the Internal Affairs reports during her testimony. Further, each officer was subpoenaed by the plaintiff to appear as a witness. The officers appeared in uniform and answered questions about the incident and the Internal Affairs investigation. Notably, none of the officers claimed a Fifth Amendment privilege or asserted any immunity in response to the questions posed

5

to them. Each officer denied assaulting Hamilton, and each of them was compensated by the County for the time spent in court.

While the civil suit was pending, Hamilton's attorney filed a civil rights complaint with the Federal Bureau of Investigation. As a result, the FBI opened a criminal investigation, which culminated in a grand jury indictment of the three officers in July 2000.[2] The indictment specifically charged that the officers, while acting under color of Florida law and "aiding and abetting one another, did willfully assault and beat" Hamilton, thereby depriving her of her constitutional rights in violation of 18 U.S.C. § 242. A second count charged Vangates alone with hindering the investigation, in violation of 18 U.S.C. § 1512(b)(3), by providing a false and misleading statement regarding the unlawful assault of Hamilton.[3]

Prior to trial, the Government filed a motion in limine seeking permission to use the testimony and exhibits from the civil trial, including the Internal Affairs file,

---

[2]Before pursuing criminal charges against the officers, the FBI investigator read portions of the Internal Affairs report from which references to the statements made by the three officers had been redacted. Vangates has not asserted any impropriety in this procedure, and we perceive none.

[3]That section of the statute makes it a crime to "hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings." 18 U.S.C. § 1512(b)(3).

as evidence in the criminal proceeding. On December 13, 2000, a magistrate judge issued a Memorandum and Order granting in part the motion in limine. He denied the motion insofar as it sought admission of the Internal Affairs file itself and any statements or summaries contained therein. He did so because the statements contained in the file were protected by Garrity when the officers gave them, and using the Internal Affairs file in the civil trial did not eliminate that protection.

The magistrate judge found, however, that, unlike the statements contained in the Internal Affairs file, the testimony given by the officers during the course of the civil trial was not protected by Garrity. First, he determined that the immunity granted by the Subject Employee Statement during the Internal Affairs investigation did not "carry over" to statements made during the civil trial. He also concluded that, even if the officers subjectively believed that the statements they made during the civil trial were compelled, there was no "objectively reasonable basis" for that belief. Accordingly, Garrity did not protect the testimony, and it was admissible in the criminal proceeding.[4]

---

[4]The magistrate judge also rejected the defendants' contention that the civil trial testimony was protected under Kastigar v. United States, 406 U.S. 441, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972). He concluded that, because Garrity protection is "tantamount to use immunity," United States v. Veal, 153 F.3d 1233, 1241 n.7 (11th Cir. 1998), the same analysis applied to that issue as to the Garrity allegation. That conclusion has not been challenged on appeal.

The district court accepted the magistrate judge's determination that the Internal Affairs file could not be used as evidence in the criminal trial. During a pretrial hearing and over the course of the trial, however, the district judge modified the magistrate judge's order. First, he held that, in addition to the Internal Affairs file itself, any civil trial testimony concerning the Internal Affairs investigation or the officers' statements during that investigation could not be introduced at the criminal trial.[5] He also prohibited any discussion or "reference whatsoever" to Internal Affairs and required that the Internal Affairs investigators be referred to simply as "officers" or "agents." The Government was permitted to reference the investigation, without mentioning Internal Affairs, only insofar as it was required to show how Hamilton filed her excessive force complaint and that Hamilton had identified the defendants in the photograph line-ups. The court permitted all other portions of the civil trial transcript not referencing the Internal Affairs investigation to be used in the criminal trial. Although the court's ruling permitted the civil trial testimony to be used in its case in chief, the Government stated during pretrial proceedings that it intended to use the testimony only for impeachment purposes.

---

[5]The district court did reserve the right to alter this ruling in the event that defense counsel "opened the door" to a discussion of the Internal Affairs investigation by, for example, mentioning the delay in bringing the criminal prosecution.

None of the officers testified at the criminal trial, and neither the civil trial testimony nor the Internal Affairs report was introduced as evidence. Indeed, there is no contention that the prosecution deviated in any way from the district court's instructions.[6]

The jury acquitted co-defendants Mas and Symonette on the one charge lodged against them but convicted Vangates on both counts. In this appeal, Vangates argues that her conviction should be overturned because the district court erred in determining that her civil trial testimony was not protected by Garrity. That error, she contends, compelled her not to take the stand in her own defense and, therefore, renders her conviction improper.

## II.

We review de novo whether Vangates's statements and testimony in the civil trial were "coerced" within the meaning of Garrity. See Taylor v. Singletary, 148 F.3d 1276, 1282-83 (11th Cir. 1998) (stating that "it is well established that

---

[6]Defense counsel did argue before the district court that two comments made during voir dire, which it perceived as implicating the Internal Affairs investigation, warranted a mistrial. The district court denied the motion, and that ruling has not been appealed.

voluntariness is a legal, not a factual issue" and then "look[ing] to the record . . . to determine whether the totality of the circumstances supports a conclusion of involuntariness") (citation omitted).

We begin our analysis with the familiar admonition that the Fifth Amendment protection against self-incrimination is not self-executing. Rather, as a general rule, to be protected a witness must assert that right specifically. Thus, a witness's answers "are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of privilege." Minnesota v. Murphy, 465 U.S. 420, 427, 104 S. Ct. 1136, 1142, 79 L. Ed. 2d 409 (1984). Further, "if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." Id. (quoting Garner v. United States, 424 U.S. 648, 654, 96 S. Ct. 1178, 1182, 47 L. Ed. 370 (1976)). An exception to this rule arises when assertion of the Fifth Amendment privilege "is penalized so as to foreclose a free choice to remain silent and compel incriminating testimony." Id. at 434, 104 S. Ct. at 1146 (internal citation and punctuation omitted). Therefore, the Fifth Amendment permits a witness to refuse to answer any question put to him "unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." Lefkowitz v. Turley, 414

U.S. 70, 78, 94 S. Ct. 316, 322, 38 L. Ed. 2d 274 (1973) (citing <u>Kastigar v. United</u>

<u>States</u>, 406 U.S. 441, 92 S. Ct. 1653 (1972)).  That protection extends to any

"proceeding, civil or criminal, formal or informal, where the answers might

incriminate him in future criminal proceedings."  <u>Murphy</u>, 465 U.S. at 426, 104 S.

Ct. at 1141 (quoting <u>Turley</u>, 414 U.S. at 77, 94 S. Ct. at 322).

This protection is often needed by public employees, for whom Fifth

Amendment law attempts to strike a balance between the privilege against self-

incrimination and the state's interest in obtaining information necessary for the

advancement of governmental functions.  <u>See</u>  <u>Turley</u>, 414 U.S. at 81, 94 S. Ct. at

38.  Thus, a public employee may not be coerced into surrendering his Fifth

Amendment privilege by threat of being fired or subjected to other sanctions, <u>see</u>

<u>Erwin v. Price</u>, 778 F.2d 668, 669 (11th Cir. 1985) (citation omitted), and cannot be

forced to choose "between self-incrimination or job forfeiture,"  <u>Garrity</u> 385 U.S. at

496, 87 S. Ct. at 618.  Indeed, "the protection . . . against coerced statements

prohibits use in subsequent criminal proceedings of statements obtained under threat

of removal from office."  <u>Id.</u> at 500, 87 S. Ct. at 620; <u>see</u> <u>also</u> <u>Hester v.</u>

<u>Milledgeville</u>, 777 F.2d 1492, 1495 (11th Cir. 1985) ("[A] governmental unit which

requires an employee to make potentially incriminating statements may not burden

11

the employee's [Fifth Amendment right] by threatening to discipline or discharge the employee if he or she refuses to waive it."). More specifically,

> Garrity protects police officers from having to choose between cooperating with an internal investigation and making potentially incriminating statements. Immunity under Garrity prevents any statements made in the course of the internal investigation from being used against the officers in subsequent criminal proceedings.

In re Federal Grand Jury Proceedings, 975 F.2d 1488, 1490 (11th Cir. 1992).

The state, of course, can compel a public employee to answer questions in a formal or informal proceeding by granting that employee immunity from future criminal prosecution based on the answers given. See 18 U.S.C. § 6002; Kastigar, 406 U.S. at 462, 92 S. Ct. at 1666. Such immunity is the equivalent of the protection afforded an officer under Garrity, and is referred to as "use immunity." See United States v. Veal, 153 F.3d 1233, 1241 n.7 (11th Cir. 1998); Hester, 777 F.2d at 1496. Ultimately, however, the state must decide whether to demand a statement from an employee on job-related matters, in which case it may not use the statement in a criminal prosecution.

In this case, Vangates was granted use immunity pursuant to the Subject Employee Statement for any statements she made during the Internal Affairs investigation, but the magistrate judge determined that such immunity did not apply to statements she made during the civil trial. Vangates appears to argue that

12

the magistrate judge erred in making this determination because her civil trial testimony simply was a continuation of the statements she made during the Internal Affairs investigation. We are unpersuaded. Each of the forms Vangates signed were limited in scope to the Internal Affairs investigation and the interview conducted by Sgt. Williams. The forms did not purport to grant immunity for statements made at any other time or for any other purpose. As the Supreme Court has said, "[u]se immunity was intended to immunize and exclude from a subsequent criminal trial only that information to which the Government expressly has surrendered future use." Pillsbury Co. v. Conboy, 459 U.S. 248, 260, 103. S. Ct. 608, 615, 74 L. Ed. 2d 430 (1983). Thus, because Vangates was not given a "duly authorized assurance of immunity at the time" she testified, the immunity she received pursuant to the Internal Affairs investigation did not apply to the statements she made subsequently at the civil trial. Id. at 263, 103 S. Ct. at 617.

Even absent an explicit grant of immunity, however, Vangates's civil trial testimony still would be protected if she had been compelled to give it. As we have explained, the formal grant of use immunity is unnecessary when the statements given are coerced. See Hester, 777 F.2d at 1496 ("In essence, the privilege against self-incrimination affords a form of use immunity which, absent waiver, automatically attaches to compelled statements as a matter of law."). See

13

also Erwin, 778 F.2d at 670. The magistrate judge referred to this protection as "self-executing Garrity immunity," and it may arise without an explicit threat of employment sanctions. See United States v. Montanye, 500 F.2d 411, 415 (2d Cir. 1974) ("The state is prohibited . . . from compelling a statement through economically coercive means, whether they are direct or indirect."); Womer v. Hampton, 496 F.2d 99, 108 (5th Cir. 1974). Indeed, "[s]ubtle pressures may be as telling as coarse and vulgar ones." Garrity, 385 U.S. at 496, 87 S. Ct. at 618 (citation omitted). See also Hester, 777 F.2d at 1495 (finding that police officers could be compelled to waive their rights by being required to choose among three forms prior to submitting to a polygraph examination).

It is true, however, that Garrity is more easily applied to situations "[w]here the state has directly presented the defendant with the Hobson's choice of either making an incriminating statement or being fired," than to cases, such as this one, in which there has been no direct threat of termination. See United States v. Camacho, 739 F. Supp. 1504, 1515 (S.D. Fla. 1990). In the absence of a direct threat, we determine whether the officer's statements were compelled by examining her belief and, more importantly, the objective circumstances surrounding it. Thus, for her statements to be protected under Garrity, the officer "must have in fact believed [the] statements to be compelled on threat of loss of job

14

and this belief must have been objectively reasonable." United States v. Friedrick, 842 F.2d 382, 395 (D.C. Cir. 1988). Put differently: "First, the defendant must have subjectively believed that he was compelled to give a statement upon threat of loss of job. Second, this belief must have been objectively reasonable at the time the statement was made." Camacho, 739 F. Supp. at 1515 (citing Friedrick, 842 F.2d at 395).[7]

---

[7]This issue is one of first impression in this circuit. Indeed, at the time it decided Friedrick, the D.C. Circuit was the only court of appeals to have adopted a test for this situation. The First Circuit had confronted a similar question in United States v. Indorato, 628 F.2d 711 (1st Cir. 1980), and applied a similar standard, but did not embrace a specific test. In Indorato, the court concluded that a police officer's testimony was not compelled because there existed no regulation or ordinance requiring that an officer be terminated or otherwise sanctioned if he invoked his Fifth Amendment privilege. The court rejected the officer's contention that his testimony was compelled because "the state police departmental rules . . . provided for the dismissal of any officer who refused to obey the lawful order of superiors," and that he would be sanctioned for refusing to obey a superior's command by refusing to answer a question. Id. at 715. The court found that "[t]here is nothing in the record to suggest that the rules have been interpreted to mean that a state police officer who refuses on fifth amendment grounds to comply with an order to provide self-incriminating statements would be dismissed," and that "the subjective fears of defendant as to what might happen if he refused to answer his superior officers are [not] sufficient to bring him within Garrity's cloak of protection." Id. at 716. Effectively, therefore, the First Circuit found that the officer's subjective belief that his testimony was compelled was not objectively reasonable. Thus, his claim also would fail the second prong of the test we adopt.

Similarly, although not confronting the issue directly, we did cite approvingly to this approach in Veal, 153 F.3d at 1239 n.4 ("The Fifth Amendment protection afforded by Garrity to an accused who reasonably believes that he may lose his job if he does not answer investigation questions is Supreme Court-created and self-

In this case, Vangates can satisfy the first prong of the test. She testified at a pretrial hearing before the district court that she believed she would have been subject to discipline if she had refused to cooperate with the County Attorney during the civil trial, and that she thought the terms of the Subject Employee Statement were applicable to her testimony at that proceeding. In addition, she was informed by counsel that statements she made during the civil trial could not be used against her personally. Although Vangates does not state specifically that she believed her testimony to be "compelled," we conclude that, under these circumstances, her statements are sufficient to evince a subjective belief that she was "compelled to give a statement upon threat of loss of job." The Government has offered no evidence or argument to refute this contention.

Vangates cannot show, however, that the belief was objectively reasonable, and this failure is fatal to her claim. In making this determination, we examine (as we must) the totality of the circumstances surrounding the testimony. See Blackburn v. Alabama, 361 U.S. 199, 206, 80 S. Ct. 274, 280, 4 L. Ed. 2d 242 (1960); Sullivan v. Alabama, 666 F.2d 478, 482-83 (11th Cir. 1982). Vangates says that three facts render objectively reasonable her belief that she would be sanctioned if she invoked her Fifth Amendment privilege: first, she was

executing; it arises by operation of law; no authority or statute needs to grant it.").

16

subpoenaed to testify at the civil trial by the plaintiff's attorney; second, she was required to appear in her uniform and was compensated by the County for the time she spent at the trial; and finally, she was not advised at the civil trial that the Subject Employee Statement was inapplicable or that she could invoke her Fifth Amendment rights.  We examine those circumstances in that order.

Initially, however, we repeat that the relevant inquiry concerns state action which may have compelled Vangates to testify.  See, e.g., Montanye, 500 F.2d at 415 ("The controlling factor is . . . the fact that the state had involved itself . . . to coerce a person into furnishing an incriminating statement.").  As the court said in Camacho,

> a necessary prerequisite to concluding that a subjective belief is objectively reasonable is that the belief derived from actions taken by the state.   A subjective belief that Garrity applies will not be considered objectively reasonable if the state has played no role in creating the impression that the refusal to give a statement will be met with termination of employment.

739 F. Supp. at 1515; see also United States v. Solomon, 509 F.2d 863, 871-72 (2d Cir. 1975) (distinguishing from Garrity a case in which the threat was not made by a state actor, and finding that "the common law rule excluding confessions induced by a threat is limited to inducement by 'a person in authority'; what is generally required is a 'legal interest in the prosecution' and 'not the mere existence of actual control or influence growing out of the social or commercial relations of the

17

persons'") (citation omitted). Accordingly, our inquiry in this case must examine the actions taken by the state or County regarding Vangates's testimony; we are not concerned with the impressions that may have been conferred by private citizens.

First, in Benjamin v. City of Montgomery, 785 F.2d 959 (11th Cir. 1986), we squarely rejected the claim that being subpoenaed to appear in court coerces a police officer to testify in that proceeding without invoking his Fifth Amendment right against self-incrimination. In that case, two police officers expressly argued that their testimony was compelled because the City of Montgomery considered appearing in court to be a condition of their employment. We rejected that claim and wrote that

> [o]bviously, it is generally expected that police officers will testify in court. This general expectation, however, does not rise to the level of coercion. Appellees cited nothing in the Montgomery Police Department regulations which specifically requires officers to testify in court at the request of criminal defendants. . . . [A]t the time they first were called to the stand, appellants were not the subject of any disciplinary proceeding, and had not been directed to answer questions on pain of dismissal. Had they testified, their answers would not have been coerced, and could later have been used against them.

Id. at 962. See also Murphy, 465 U.S. at 427, 104 S. Ct. at 1142 ("[T]he general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones."); Gardner v.

18

Broderick, 392 U.S. 273, 279, 88 S. Ct. 1913, 1916, 20 L. Ed. 2d. 1082 (1968) ("Petitioner could not have assumed -- and certainly he was not required to assume -- that he was being asked to do an idle act of no legal effect."). The analysis in Benjamin changed, however, when the Mayor expressly ordered the officers to testify. We concluded that, only then, were the officers' statements compelled by state action.

In this case, notably, Vangates was subpoenaed to appear at the civil trial by Hamilton's lawyer, a private attorney, and she has produced no evidence of any state action compelling her testimony. We can find no statute, regulation, or policy requiring her to forgo her Fifth Amendment rights in such a proceeding, and we have been cited to none. Moreover, although it could have done so, the Corrections Department did not issue an order requiring Vangates to testify and informing her that she would be subject to sanctions if she failed to do so. Thus, there simply is no basis upon which Vangates could have formed an objectively reasonable belief that some state action compelled her to forgo her Fifth Amendment rights during the civil trial.

This analysis is not altered in any way simply because Vangates appeared at the civil trial in uniform and was compensated by the County for her time. Those facts demonstrate that Vangates was acting within the scope of her official duties,

19

but they do not constitute coercive state action. Nor does Vangates's allegation that she was told to "cooperate" during the civil proceedings mean that she was compelled to forgo her Fifth Amendment protection. Significantly, she was not told that she would be sanctioned if she failed to testify, and certainly she was not required to waive her Fifth Amendment rights. The general directive to cooperate was not sufficiently coercive to create an objectively reasonable belief that Vangates would be sanctioned if she invoked her Fifth Amendment rights.

Finally, the fact that her private attorney failed to inform Vangates that she could invoke her Fifth Amendment privilege does not render Vangates's testimony involuntary. See United States v. White, 589 F.2d 1283, 1285 (5th Cir. 1979) (finding that the attorney's "failure to inform White of his fifth amendment privilege in the civil context does not make the testimony given in the civil case involuntary").[8] Indeed, "[a]dvice of counsel, alone, may not provide the Defendants with a claim that they have been coerced into giving statements. There must be some demonstrable state conduct . . . . Otherwise, a defense lawyer could effectively confer use immunity on a client without any state action." Camacho, 739 F. Supp. at 1518. Vangates's separate counsel was not a state a actor but,

_____

[8]The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

20

rather, a private attorney retained by the County to represent Vangates and her codefendants. Plainly, counsel's actions cannot form the basis for an objectively reasonable belief that state action compelled Vangates's statements.

Indeed, the very fact that Vangates had separate counsel in this case makes it even less likely that she was compelled to testify by the County or the state. Private counsel owed a duty to Vangates, not to the County which hired her. Moreover, the attorney was available to consult with Vangates throughout the proceedings if she felt compelled to give testimony in contravention of her Fifth Amendment right. Simply put, separate legal representation is still another powerful indicator that state action did not drive Vangates to testify at the civil trial.

In sum, after thorough review of this record, we conclude that, taken together, the circumstances surrounding Vangates's testimony at the civil trial do not amount to coercive state action. Vangates's subjective belief that she faced employment sanctions if she invoked her Fifth Amendment right and refused to answer questions posed during the civil trial was not objectively reasonable. That testimony is not protected by Garrity, and the district court did not err in determining that it was admissible against Vangates. Her conviction, therefore, is affirmed.

**AFFIRMED.**